# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re Automotive Parts Antitrust Litigation | Master File No. 12-md-02311 |
| In re: Occupant Safety Restraint Systems | |
| This document relates to: | |
| Rush Truck Centers of Arizona, Inc.; Rush Truck Centers of California, Inc.; Rush Truck Centers of Colorado, Inc.; Rush Truck Centers of Florida, Inc.; Rush Truck Centers of Georgia, Inc.; Rush Truck Centers of Idaho, Inc.; Rush Truck Centers of Illinois, Inc.; Rush Truck Centers of Indiana, Inc.; Rush Truck Centers of Kansas, Inc.; Rush Truck Centers of Missouri, Inc.; Rush Truck Centers of North Carolina, Inc.; Rush Truck Centers of Ohio, Inc.; Rush Truck Centers of Oklahoma, Inc.; Rush Truck Centers of Oregon, Inc.; Rush Truck Centers of Tennessee, Inc.; Rush Truck Centers of Texas, LP.; Rush Truck Centers of Utah, Inc.; Rush Truck Centers of Virginia, Inc., *on behalf of themselves and all others similarly situated,* | No: **Jury Trial Demanded** |
| Plaintiffs, | |
| v. | |
| TRW Automotive Holdings Corp., TRW Deutschland Holding Gmbh, Takata Corp., TK Holdings, Inc., Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG, Autoliv Japan Ltd., Tokai Rika Co., Ltd., and TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. | |
| Defendants. | |

## TRUCK AND EQUIPMENT DEALERS
## CLASS ACTION COMPLAINT

PLAINTIFFS Rush Truck Centers of Arizona, Inc. ("Rush AZ"), Rush Truck Centers of

California, Inc. ("Rush CA"), Rush Truck Centers of Colorado, Inc. ("Rush CO"), Rush Truck

Centers of Florida, Inc. ("Rush FL"), Rush Truck Centers of Georgia, Inc. ("Rush GA"), Rush

Truck Centers of Idaho, Inc. ("Rush ID"), Rush Truck Centers of Illinois, Inc. ("Rush IL"), Rush

Truck Centers of Indiana, Inc. ("Rush IN"), Rush Truck Centers of Kansas, Inc. ("Rush KS"),

Rush Truck Centers of Missouri, Inc. ("Rush MO"), Rush Truck Centers of North Carolina, Inc.

("Rush NC"), Rush Truck Centers of Ohio, Inc. ("Rush OH"), Rush Truck Centers of Oklahoma,

Inc. ("Rush OK"), Rush Truck Centers of Oregon, Inc. ("Rush OR"), Rush Truck Centers of

Tennessee, Inc. ("Rush TN"), Rush Truck Centers of Texas, LP. ("Rush TX"), Rush Truck

Centers of Utah, Inc. ("Rush UT"), and Rush Truck Centers of Virginia, Inc. ("Rush VA"),

(collectively "Plaintiffs") file this Complaint on behalf of themselves and all other similarly

situated dealers (the "Classes" as defined below) of medium-duty (Class 4, 5, 6, & 7) trucks and

heavy-duty (Class 8) trucks, buses, commercial vehicles (excluding automobiles, light trucks,

vans, sports utility vehicles, and/or similar motor vehicles sold by automobile dealers),

construction equipment, mining equipment, agricultural equipment, railway vehicles, and other

similar vehicles (collectively, "Trucks and Equipment").

     Plaintiffs bring this class action for damages, injunctive relief, and other relief pursuant to

federal antitrust laws and state antitrust, unfair competition, and consumer protection laws,

demand a trial by jury, and allege as follows:

**NATURE OF ACTION**

     1.    Plaintiffs bring this lawsuit as a proposed class action against the Defendants

(defined below), manufacturers, and suppliers of Occupant Safety Restraint Systems (defined

below) globally and in the United States for engaging in a lengthy conspiracy to suppress and

eliminate competition in the vehicle parts industry by agreeing to rig bids for, and to fix,

stabilize, and maintain the prices of these products, which were sold to vehicle manufacturers in

the United States and elsewhere.  The Defendants' conspiracy successfully targeted the United

2

States vehicle industry, raising prices for truck and equipment manufacturers, truck and equipment dealers, and consumers.

2.      "Occupant Safety Restraint Systems" are generally comprised of the parts in a vehicle that protect drivers and passengers from bodily harm.  Types of different Occupant Safety Restraint Systems include seat belts, airbags, steering wheels, and steering systems.

3.      The "Class Period" refers to January 2003 to the present.

4.      The Defendants manufacture, market, and sell Occupant Safety Restraint Systems throughout the United States and in other countries.

5.      Vehicles containing Occupant Safety Restraint Systems, as well as Occupant Safety Restraint Systems themselves, made by Defendants, are sold in every state of the United States and the District of Columbia.

6.      The Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to rig bids for, and to fix, stabilize, and maintain the prices of Occupant Safety Restraint Systems.  They carried out their conspiracy by agreeing, during meetings and conversations, to allocate the supply of Occupant Safety Restraint Systems on a model-by-model basis.  Defendants then sold Occupant Safety Restraint Systems at noncompetitive prices to vehicle manufacturers in the United States and elsewhere, for sale in United States.

7.      Competition authorities in the United States and the European Union have been investigating a conspiracy in the market for Occupant Safety Restraint Systems.  As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Occupant Safety Restraint Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices.  The European Commission Competition

Authority ("EC") has also conducted investigations at the European offices of several of the Defendants.

8.     Defendant Autoliv, Inc. has agreed to plead guilty and pay a $14.5 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Occupant Safety Restraint Systems sold to certain vehicle manufacturers in the United States and elsewhere at various times from at least as early as March 2006 and continuing until at least February 2011.  The combination and conspiracy engaged in by Defendant Autoliv, Inc. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.     Defendant TRW Deutschland Holding Gmbh has agreed to plead guilty and to pay a total of $5.1 million in criminal fines concerning a two-count criminal investigation for fixing the prices of seatbelts, steering wheels and airbags.

10.     Defendant Tokai Rika Co., Ltd. has agreed to pay a $17.7 million fine and plead guilty to a two-count criminal information charging Tokai Rika with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Heater Control Panels sold to a manufacturer from at least September 2003 until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

11.     Defendant Takata Corporation announced that it agreed to pay a $71.3 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to manufacturers, including, Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and

Mazda, in the United States and elsewhere from at least as early as January 1, 2003 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1.

12.     These investigations and guilty pleas are part of and the result of a larger investigation by the DOJ, FBI, EC, and the Japan Fair Trade Commission ("JFTC") into an expansive industry-wide vehicle components conspiracy, including many different component parts, including parts sold for Trucks and Equipment.

13.     On March 29, 2013, the Japan Fair Trade Commission ("JFTC")  issued cease and desist orders and surcharge payment orders based on violations of the Japan Antimonopoly Act against NTN Corp., NSK Ltd. and Nachi-Fujikoshi Corp., for conspiring to fix prices on "*industrial machinery bearings* and automotive bearings."

14.     On March 19, 2014, the EC stated that it had found that SKF, Schaeffler, JTEKT Corporation, NSK Ltd., Nachi-Fujikoshi, and NTN had operated a cartel in the market for bearings sold to "car, *truck* and car part manufacturers*"* and fined all those companies (excluding JTEKT, which benefitted from immunity for having revealed the existence of a cartel to the EC) a collective EUR 953 million.

15.     On March 31, 2015, the Department of Justice announced that Robert Bosch GmbH had agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix the prices for parts, including spark plugs, oxygen sensors and starter motors "sold to automobile *and internal combustion engine manufacturers* in the United States and elsewhere," including parts sold to equipment manufacturer Andreas Stihl AG & Co., from at least as early as January 2000 until at least July 2011.

16.     Many of the companies involved in the government investigations into the industry wide components price fixing conspiracy, including the Defendants in this case, also manufacture and sell parts for Trucks and Equipment.

17.     Many of the Original Equipment Manufacturers ("OEMs') who have been identified as the targets of the conspiracy, including Toyota, Honda, Ford, Chrysler, Mitsubishi Motors, Subaru, Fuji Heavy Industries, Isuzu and Nissan, manufacture and sell Trucks and/or Equipment directly or through subsidiaries or affiliated companies.

18.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Class paid artificially inflated prices for Occupant Safety Restraint Systems or for trucks and equipment containing Occupant Safety Restraint Systems.  Plaintiffs and the members of the Classes have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the matter or controversy exceeds the sum of $5,000,000,

exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

21.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

22.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Occupant Safety Restraint Systems throughout the United States that were specifically designed for vehicles that were intended to be sold in the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; (d) was through its own actions and through the actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States; (e) targeted customers in the United States, including this district, and/or (f) engaged in actions in furtherance of an illegal conspiracy in this district either itself or through its co-conspirators. Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

7

23.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anti-competitive effects upon interstate commerce within the United States and upon import trade and commerce into the United States.

24.     The activities of Defendants and their co-conspirators were within the flow of, were intended to have, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products are sold in the flow of interstate commerce.

25.     Occupant Safety Restraint Systems manufactured abroad by Defendants and sold for use in vehicles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale and, therefore, constitute import commerce.  To the extent any Occupant Safety Restraint Systems are purchased in the United States, and such Occupant Safety Restraint Systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

26.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Occupant Safety Restraint Systems, and that conspiracy unreasonably restrained trade and adversely affected the market for Occupant Safety Restraint Systems.

27.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Occupant Safety Restraint Systems, including Plaintiffs and the Classes.

## PARTIES

### The Plaintiffs

28.     Plaintiff Rush AZ is a Delaware corporation with its principal place of business in Arizona. Rush AZ is an authorized Peterbilt and Hino dealer. During the Class Period Rush AZ purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush AZ also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush AZ purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Arizona.

29.     Plaintiff Rush CA is a Delaware corporation with its principal place of business in California. Rush CA is an authorized Peterbilt, Hino, Isuzu, and Ford dealer. During the Class Period Rush CA purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush CA also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush CA purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in California.

30.     Plaintiff Rush CO is a Delaware corporation with its principal place of business in Colorado. Rush CO is an authorized Peterbilt, Isuzu, and Ford dealer. During the Class Period Rush CO purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant

Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush CO also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush CO purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Colorado.

31.     Plaintiff Rush FL is a Delaware corporation with its principal place of business in Florida. Rush FL is an authorized Peterbilt, Hino, and Isuzu dealer. During the Class Period Rush FL purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush FL also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush FL purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Florida.

32.     Plaintiff Rush GA is a Delaware corporation with its principal place of business in Georgia. Rush GA is an authorized International, Hino, Isuzu, and IC Bus dealer. During the Class Period Rush GA purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush GA also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush GA purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Georgia.

33.     Plaintiff Rush ID is a Delaware corporation with its principal place of business in Idaho. Rush ID is an authorized International, Autocar, and IC Bus dealer. During the Class

Period Rush ID purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush ID also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush ID purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Idaho.

34.    Plaintiff Rush IL is a Delaware corporation with its principal place of business in Illinois. Rush CA is an authorized International dealer. During the Class Period Rush IL purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush IL also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush IL purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Illinois.

35.    Plaintiff Rush IN is a Delaware corporation with its principal place of business in Indiana. Rush IN is an authorized International dealer. During the Class Period Rush IN purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush IN also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush IN purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Indiana.

36.     Plaintiff Rush KS is a Delaware corporation with its principal place of business in Kansas. Rush CA is an authorized Hino and Isuzu dealer. During the Class Period Rush KS purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush KS also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush KS purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Kansas.

37.     Plaintiff Rush MO is a Missouri corporation with its principal place of business in Missouri. Rush MO is an authorized International dealer. During the Class Period Rush MO purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush MO also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush MO purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Missouri.

38.     Plaintiff Rush NC is a Delaware corporation with its principal place of business in North Carolina. Rush NC is an authorized International, Peterbilt, Hino, and Isuzu dealer. During the Class Period Rush NC purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush NC also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service

business during the Class Period.  Rush NC purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in North Carolina.

39.     Plaintiff Rush OH is a Delaware corporation with its principal place of business in Ohio. Rush OH is an authorized International, IC Bus, Isuzu, Ford, and Mitsubishi dealer. During the Class Period Rush OH purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush OH also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush OH purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Ohio.

40.     Plaintiff Rush OK is a Delaware corporation with its principal place of business in Oklahoma. Rush OK is an authorized Peterbilt, Hino, Isuzu, and Ford dealer. During the Class Period Rush OK purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush OK also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush OK purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Oklahoma.

41.     Plaintiff Rush OR is a Delaware corporation with its principal place of business in California. Rush OR is an authorized International dealer. During the Class Period Rush OR purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush OR also purchased Occupant Safety Restraint Systems manufactured by one or more of the

Defendants or their co-conspirators for its repair and service business during the Class Period. Rush OR purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Oregon.

42.    Plaintiff Rush TN is a Delaware corporation with its principal place of business in Tennessee. Rush TN is an authorized Peterbilt dealer. During the Class Period Rush TN purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush TN also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush TN purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Tennessee.

43.    Plaintiff Rush TX is a Texas limited partnership with its principal place of business in Texas. Rush TX is an authorized Peterbilt, Hino, Isuzu, Blue Bird, Micro Bird, Elkhart, and Ford dealer. During the Class Period Rush TX purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush TX also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush TX purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Texas.

44.    Plaintiff Rush UT is a Delaware corporation with its principal place of business in Utah. Rush UT is an authorized International, IC Bus, Autocar, and Mitsubishi Fuso dealer. During the Class Period Rush UT purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the

Defendants or their co-conspirators. Rush UT also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period.  Rush UT purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Utah.

45.     Plaintiff Rush VA is a Delaware corporation with its principal place of business in Virginia. Rush VA is an authorized International dealer. During the Class Period Rush VA purchased, displayed, advertised, and sold Trucks and Equipment containing Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators. Rush VA also purchased Occupant Safety Restraint Systems manufactured by one or more of the Defendants or their co-conspirators for its repair and service business during the Class Period. Rush VA purchased and received both the aforementioned Trucks and Equipment and Occupant Safety Restraint Systems in Virginia.

**The Defendants**

**TRW Defendants**

46.     Defendant TRW Automotive Holdings Corp. ("TRW U.S.") is a Delaware corporation with its principal place of business in Livonia, Michigan. TRW U.S., directly or through its wholly-owned and/or controlled subsidiaries, manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

47.     Defendant TRW Deutschland Holding Gmbh ("TRW Germany") is a German corporation with its principal place of business in Koblenz, Germany. Defendant TRW Germany is a subsidiary of and wholly-owned and/or controlled by Defendant TRW U.S. Defendant TRW Germany, directly and/or through its subsidiaries which it wholly owned and/or controlled,

manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities were under the control and direction of TRW U.S., which controlled its policies, sales, and finances.

48.    TRW Germany and TRW U.S. are collectively referred to as "TRW."

**Takata Defendants**

49.    Defendant Takata Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Takata Corp. directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

50.    Defendant TK Holdings, Inc. ("TK"), is a Delaware corporation with its principal place of business in Auburn Hills, Michigan. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Takata. Defendant TK manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

51.    Executives who have worked at Takata Corp., in Japan, have also worked at TK, in the U.S. Yoshiyasu Kikuchi, an executive officer at Takata Corp. is a director at TK. Yoichiro Nomura, the Chief Financial Officer at Takata Corp. is a director at TK. Juichiro Takada, the

former Chairman and CEO of Takata Corp. was also a director at TK. Shunkichi Shimizu, a former executive officer at Takata Corp., in charge of "America Operations," was also the president and secretary of TK Holdings. Takata Corporation also refers to TK Holdings as its American headquarters, stating "Takata's regional headquarters for the Americas is in Auburn Hills, Michigan."

52.     Takata has targeted the U.S. and U.S. customers in a myriad of ways. Takata's annual report states that "Takata and GM jointly developed a front center airbag, which will be installed in GM's 2013 models." http://www.takata.com/ir/pdf/material05/120831ar en.pdf at 36. Takata's 2011 report states that "auto industry in North America is expected to continue its recovery, and we will tap growing demand for high value added safety products such as curtain airbags and side airbags . . . "http://www.takata.com/ir/pdf/material05/110829ar en.pdf at 11. Takata's 2011 report reviewed new U.S. regulations regarding vehicle restraints, which it deemed "driver[s] of growth," for its business.  *Id.* at 20. Takata's report also announces that "[i]n April 2010, Takata Corporation was chosen by Ford Motor Company to be one of 13 suppliers newly added to Ford's Aligned Business Framework (ABF) for closer collaboration and long-term partnership." It also states that "[t]he close proximity of Ford and Takata's North American headquarters in southeast Michigan has enabled synergies that in recent years have strengthened the partnership between the two companies." *Id.* at 22. Takata's report also mentions specific initiatives aimed at the U.S. market including "buckle-up campaigns, child restraint training sessions at maternity classes, anti drunk driving campaigns, and skill improvement courses such as those we run in the United States."

53.     Defendants Takata Corp. and TK are collectively referred to as "Takata."

**Autoliv Defendants**

54. Defendant Autoliv, Inc. ("Autoliv") is a Delaware corporation with its principal place of business in Stockholm, Sweden. Defendant Autoliv, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

55. Defendant Autoliv ASP, Inc. is an Indiana corporation with its principal place of business in Ogden, Utah. It is a subsidiary of and wholly owned and/or controlled by its Swedish parent, Autoliv, Inc. Defendant Autoliv ASP, Inc. manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

56. Defendant Autoliv B.V. & Co. KG is a German corporation with its principal place of business in Elmshorn, Germany. It is a subsidiary of and wholly owned and/or controlled by its Swedish parent, Autoliv, Inc. Defendant Autoliv B.V. & Co. KG manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

57. Autoliv Japan Ltd. is a Japanese corporation with its principal place of business in Yokohama, Japan. It is a wholly owned and/or controlled subsidiary of Autoliv, Inc. Autoliv Japan Ltd. manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

58. Defendants Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG and Autoliv Japan Ltd. are collectively referred to as "Autoliv."

**Tokai Rika Defendants**

59. Defendant Tokai Rika Co., Ltd. is a Japanese corporation with its principal place of business in Aichi, Japan. Defendant Tokai Rika Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members.

60. Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Tokai Rika Co., Ltd. Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. manufactured, marketed, and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Occupant Safety Restraint Systems to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were

under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

61.     Executives who have worked at Tokai Rika Co. Ltd. have also worked at TRAM, Inc. For instance, Masayuki Morita, the President and Chief Operating Officer at TRAM, Inc. previously served as a Managing Director and Director at Tokai Rika Co., Ltd. Yoshihei Iida, the former Chairman of Tokai Rika Co. Ltd., is a Board member at TRAM, Inc. Kiyoshi Kinoshita, the former Chairman of the Board and Representative Director, at Tokai Rika Co. Ltd., was also previously the President of TRAM, Inc.

62.     The same year that TRAM was established in the U.S., Tokai Rika received its "QS9000 certification," a quality standard the possession of which was required by the three major U.S. manufacturers: Ford, GM and Chrysler.

63.     Defendants Tokai Rika Co., Ltd. and TRAM, Inc. are collectively referred to as "Tokai Rika."

## AGENTS AND CO-CONSPIRATORS

64.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged.

65.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

66.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents,

employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.     The Occupant Safety Restraint Systems Industry

67.     Occupant Safety Restraint Systems are generally comprised of the parts in a vehicle that protect drivers and passengers from bodily harm. Occupant Safety Restraint Systems include seat belts, air bags, steering wheels (or steering systems), and safety electronic systems.



Figure 1

68.     Occupant Safety Restraint Systems are installed by original equipment manufacturers ("OEMs") in new Trucks and Equipment as part of the manufacturing process. They are also installed in Trucks and Equipment to replace worn out, defective, or damaged Occupant Safety Restraint Systems.

69.     Many automobile OEMs including Ford, General Motors, Isuzu, Fuji Heavy Industries, Nissan, Subaru, Honda, and Chrysler manufacture and sell Trucks and/or Equipment. Other automobile OEMs, including Toyota, Daimler, and Mitsubishi, sell Trucks and Equipment through subsidiaries or other affiliated companies.  For example, Toyota is the majority owner of Hino Motors ("Hino").  Hino represents the Toyota Group in the market for medium duty trucks, heavy duty trucks, and buses.  Daimler owns approximately 90% of Mitsubishi Fuso Truck and Bus Corp. ("Fuso").  Mitsubishi also owns and has owned an interest in Fuso throughout the Class Period.  Fuso represents the Daimler Group in the market for medium duty trucks.

70.     Trucks and Equipment OEMs, who are mostly large manufacturers such as International, Peterbilt, Kenworth, Daimler, Volvo, Mack, Hino, Isuzu, Fuso, Autocar, Ford and others, purchase Occupant Safety Restraint Systems directly from parts suppliers such as Defendants.

71.     Occupant Safety Restraint Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier I Manufacturers" in the Truck and Equipment industry.  A Tier I manufacturer supplies Occupant Safety Restraint Systems directly to an OEM.

72.     When purchasing Occupant Safety Restraint Systems, OEMs issue Requests for Quotation ("RFQs") to vehicle parts suppliers—Occupant Safety Restraint Systems are not commodity items. Vehicle parts suppliers submit quotations, or bids, to OEMs in response to RFQs and the OEMs usually award the business to the selected vehicle parts supplier for four to six years. Typically, the bidding process begins approximately three years prior to the start of production of a new model.

73.     Suppliers, including Defendants, supply OEMs with both Occupant Safety Restraint Systems to be installed in Trucks and Equipment, and Occupant Safety Restraint Systems to be used for replacement purposes.

74.     The Defendants and their co-conspirators supplied Occupant Safety Restraint Systems to OEMs for installation in Trucks and Equipment manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Occupant Safety Restraint Systems (a) in the United States for installation in Trucks and Equipment manufactured and sold in the United States, (b) abroad for export to the United States and installation in Trucks

and Equipment manufactured and sold in the United States, and (c) abroad for installation in

Trucks and Equipment manufactured abroad for export to and sale in the United States.

75.     Upon information and belief, Defendants' employees responsible for negotiating

the prices and terms for parts, including Occupant Safety Restraint Systems, were involved in

sales to Truck and Equipment manufacturers as well as to automobile manufacturers.

76.     TRW's main customers include: GM, Chrysler, Ford, Mercedes, Renault, Nissan,

Fiat, Toyota, BMW, Honda, Hyundai, Volkswagen, and Daimler Trucks.

77.     Takata's main customers include: Toyota, Honda, BMW, Mazda, Nissan, GM,

Chrysler, Ford, and Kenworth.

78.     Autoliv's main customers include: GM, Ford, Nissan, Renault, Hyundai, Kia,

VW, Chrysler, Fiat, Honda, Toyota, BMW, Mercedes, Daimler, Volvo, Scania, Navistar, and

Mitsubishi-Fuso.

79.     Tokai Rika's main customers include: Toyota, Subaru, SAAB, Volvo, Nissan,

Subaru, Isuzu, GM, Ford, Suzuki, Mazda, Mitsubishi, Chrysler, and Hino.

80.     Plaintiffs and members of the proposed Classes purchased Occupant Safety

Restraint Systems indirectly from the Defendants and their co-conspirators. By way of example,

Truck and Equipment dealers indirectly purchase Occupant Safety Restraint Systems from the

Defendants when they purchase new Trucks and Equipment to sell or lease to consumers.

Likewise, when repairing a damaged vehicle or when the vehicle's Occupant Safety Restraint

Systems are defective, Plaintiffs and other Truck and Equipment dealers indirectly purchase

replacement Occupant Safety Restraint Systems from Defendants.

81.     Replacement Occupant Safety Restraint Systems sold by OEMs to dealerships are

the same as the Occupant Safety Restraint Systems installed in Trucks and Equipment and are

made by the same manufacturer who made the Occupant Safety Restraint Systems originally installed—that is the purpose of an OEM part, made by the OEM supplier. Such replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts. The prices of replacement Occupant Safety Restraint Systems were inflated by Defendants' collusion.

82.     According to Autoliv's 2011 Annual Report, the global market for Occupant Safety Restraint Systems in 2010 was $18.1 billion and the North American market for Occupant Safety Restraint Systems was $4.2 billion.

83.     The global Occupant Safety Restraint Systems market is dominated and controlled by large manufacturers, the top three of which are Defendants who control almost 75% of the market. The Autoliv Defendants account for more than 33% of the global market for Occupant Safety Restraint Systems; as Autoliv states in its 2011 Annual Report, it is "the world's largest automotive safety supplier with sales to all the leading car manufacturers in the world." TRW accounts for approximately 20% of the global market for Occupant Safety Restraint Systems. And, the Takata Defendants account for approximately 20% of the Occupant Safety Restraint Systems global market.

84.     By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Occupant Safety Restraint Systems in the United States and the world.

85.     Airbags are a type of Occupant Safety Restraint System. Airbags are occupant restraints designed to control the movement of an occupant inside a vehicle in the event of a collision. An Airbag consists of a light fabric air bag, an inflator, which, through use of pressurized gas (typically generated by pyrotechnic materials), rapidly inflates the Airbag upon deployment, and an initiator to initiate the deployment. It may also include, depending on the

requirements of the vehicle manufacturer, an injection molded plastic decorative cover or other devices associated with the Airbag. According to the National Highway Traffic Safety Administration, a typical new Airbag retailed for approximately $1,000 from a dealer in 2011.

86.     In 2012, the total dollar-value of Airbags sold in the U.S. reached $6.7 billion.

87.     According to Autoliv's website, it manufactures more than one-third of the Airbags sold in North America, and according to its 2011 10-K, Autoliv manufactures more than 40% of the side Airbags and almost 30% of the frontal Airbags sold in the world. TRW and Takata are also major manufacturers of Airbags.

88.     Seatbelts are another type of Occupant Safety Restraint System. Seatbelts are safety strap restraints designed to secure an occupant in position in a vehicle in the event of a collision. A Seatbelt includes belt webbing, a buckle, a retractor, and hardware for installation in a vehicle. It may also include, depending on the requirements of the vehicle manufacturer, a height adjuster, a pretensioner, or other devices associated with the Seatbelt. In 2012, the total dollar-value of Seatbelts sold in the U.S. reached over $900 million.

89.     According to Autoliv's website, it manufactures almost one-third of the Seatbelts sold in North America, and according to its 2011 10-K, Autoliv manufactures 40% of the Seatbelts sold in the world. TRW and Takata are also major manufacturers of Seatbelts.

90.     Steering Wheels are another type of Occupant Safety Restraint System. Steering Wheels consist of a die-cast armature (frame) covered by molded polyurethane. Steering Wheels are then finished with leather, wood trim, or plastic, and may include various electronic features and controls, depending on the requirements of a vehicle manufacturer.

91.     In 2012, the dollar-value for Steering Wheels and related components sold in the U.S. reached $2.24 billion.

92.     According to its website, Autoliv manufactures more than 15% of the Steering Wheels sold in North America, and in its 2011 10-K, Autoliv states that it manufactures almost 30% of the Steering Wheels sold in the world. TRW and Takata are also major manufacturers of Steering Wheels.

**B.     The Structure and Characteristics of the Occupant Safety Restraint Systems Market Render the Conspiracy More Plausible.**

93.     The structure and other characteristics of the Occupant Safety Restraint Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in these markets. Specifically, the Occupant Safety Restraint Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

**1.     The Occupant Safety Restraint Systems Market Has High Barriers to Entry.**

94.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

95.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Occupant Safety Restraint Systems market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

96.     In addition, an OEM cannot freely change its suppliers of Occupant Safety Restraint Systems because OEMs design the features of their vehicles, including the electronics, mechanics, thermal distribution, and other features, so that they may be integrated with a

26

selected Occupant Safety Restraint System. Thus, it would be difficult for a new competitor to enter the market after a vehicle has been specifically designed to be integrated with a particular Occupant Safety Restraint System.

97.     Research and development costs are also significant for Occupant Safety Restraint Systems, creating an additional barrier to entry. Airbags are constantly researched for better deployment speeds, Seatbelts are constantly researched for better functionality and quality, and Steering Wheels are constantly researched for better precision and rotation.

98.     Defendants also own several patents for Occupant Safety Restraint Systems. For example, TRW owns Airbag, Steering Wheel and Seatbelt patents. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

### 2.     There is Inelasticity of Demand for Occupant Safety Restraint Systems.

99.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

100.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

101.    Demand for Occupant Safety Restraint Systems is highly inelastic. This is because there are no close substitutes for these products. Additionally, customers must purchase Occupant Safety Restraint Systems as essential parts of a vehicle, regardless of whether prices are kept at supra-competitive levels. Customers wanting to purchase Trucks and Equipment simply have no choice but to purchase Occupant Safety Restraint Systems.

**3.    The Market for Occupant Safety Restraint Systems is Highly Concentrated.**

102.    Defendants dominate the Occupant Safety Restraint Systems market. Three of the Defendants control almost 75% of the global market.

**4.    Defendants Had Ample Opportunities to Conspire**

103.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. In a June 6, 2012, press release, the DOJ explained that Defendant Autoliv and its co-conspirators met in secret and agreed to allocate the supply of various automotive parts. According to the Autoliv information, Autoliv and its coconspirators participated in meetings, conversations and communications to discuss and agree on the bids and price quotations to be submitted to certain manufacturers for Occupant Safety Restraint Systems, and agreed, during meetings, conversations and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain manufacturers on a model-by-model basis.

**C.    Government Investigations**

104.    A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada, and Japan, aimed at suppliers of vehicle parts in general and Occupant Safety Restraint Systems in particular. The DOJ has confirmed that its vehicle parts investigation is the

largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. Almost $1 billion in criminal fines have already been levied against various vehicle parts manufacturers.

105.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC. The EC and the FBI have executed surprise raids at the European and U.S. offices of several vehicle parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of vehicle parts.

106.    Defendants Autoliv, TRW, and Takata have admitted that they are cooperating with the antitrust investigators. Autoliv, Inc. stated in its 2011 Annual Report that its subsidiary, Autoliv ASP, Inc., received a grand jury subpoena from the Antitrust Division of the United States Department of Justice on February 8, 2011. "The subpoena requested documents and information as part of a long-running investigation into possible anticompetitive behavior among certain suppliers to the automotive vehicle industry, including Autoliv." Autoliv, Inc.'s 2011 Annual Report also stated that, on June 7-9, 2011, representatives of the EC visited two facilities of Autoliv B.V. & Co. KG to gather information for a similar inquiry.

107.    TRW stated in its 2011 Annual Report that "in June 2011, European antitrust authorities visited certain of our Occupant Safety Systems business unit locations in Germany to gather information. We also received a subpoena related to the Antitrust Investigations in the United States from the U.S. Department of Justice."

108.    On February 23, 2010, investigators from the FBI raided the Plymouth, Michigan, offices of Tokai Rika as part of a federal antitrust investigation. Special Agent Sandra Berchtold

stated that the affidavits that contain facts supporting issuance of the search warrants were filed in federal court under seal.

109.     Takata Corp. stated in its 2011 Annual Report that TK Holdings, Inc., a U.S. subsidiary, "became the subject to an investigation conducted by the Federal Bureau of Investigation on February 8, 2011. TK Holdings, Inc. is cooperating fully with the investigation." Alby Berman, vice-president of marketing and public relations for TK Holdings, Inc., said the subpoena "targeted safety system suppliers - seat belts, air bags, steering wheels and safety electronics - any communications with competitors, and specifically mentioned Tokai Rika" and that the subpoena targeted communications dating back to January 1, 2005. Special Agent Sandra Berchtold, media coordinator for the FBI, confirmed that the FBI raided TK Holdings, Inc.'s offices in Auburn Hills, Michigan.

110.     The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.

111.     To obtain the search warrant to raid TK Holdings, Inc., the FBI was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### D.      Guilty Plea Agreements

**Autoliv's Plea Agreement**

112.     Defendant Autoliv has pleaded guilty and agreed to pay a total of $14.5 million in criminal fines concerning a two-count criminal investigation for fixing the prices of seatbelts, steering wheels, and airbags. Autoliv has admitted to conspiring with others to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Occupant Safety Restraint Systems sold to certain manufacturers in the United States and elsewhere at various times from at least as early as March 2006 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1.  Among other things, Autoliv admitted to: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain manufacturers for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain manufacturers for Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain manufacturers on a model-by-model basis; (d) submitting bids and price quotations to certain manufacturers in accordance with the agreements reached; (e) selling Occupant Safety Restraint Systems to certain manufacturers at collusive and noncompetitive prices; and (f) accepting payment for Occupant Safety Restraint Systems sold to certain manufacturers at collusive and noncompetitive prices.

113.     The plea agreement requires it and its subsidiaries to cooperate with the DOJ, including producing documents in their control and providing their "directors, officers and employees" for interviews and the provision of testimony in grand jury, trial and other judicial proceedings.

114.    The plea agreement further provides that upon acceptance of the agreement, the United States will not bring further criminal charges against, among other entities, Autoliv Inc.'s subsidiaries arising out of the conspiracy.

115.    Pursuant to the plea agreement, Autoliv Inc. agreed that if the United States determines that it or its subsidiaries fail to provide truthful and continuing cooperation, the United States could elect to subject Autoliv Inc. or its subsidiaries to criminal prosecution and that the United States would have the right, among other things, to prosecute both Autoliv Inc. and its subsidiaries for the conspiracy set forth in the plea agreement.

116.    In addition to Autoliv, Takayoshi Matsunaga, the former Vice President of the Toyota Global Business Unit at Autoliv Japan, pleaded guilty to a one count Criminal Information charging him with participating in a conspiracy to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seat belts sold to Toyota in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. In connection with his guilty plea, Matsunaga was criminally fined $20,000 and sentenced to serve one year and one day in a U.S. prison.

**Takata's Plea Agreement**

117.    On October 9, 2013, Defendant Takata Corporation announced that it agreed to pay a $71.3 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to manufacturers, including, Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and Mazda, in the United States and elsewhere from at least as early as January 1, 2003 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1. According to the Information filed, Defendant Takata Corporation and its co-conspirators carried

out the Occupant Safety Restraint Systems conspiracy by: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to manufacturers for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to manufacturers for Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to manufacturers on a model-by-model basis; (d) submitting bids and price quotations to manufacturers in accordance with the agreements reached; (e) selling Occupant Safety Restraint Systems to manufacturers at collusive and noncompetitive prices; and (f) accepting payment for Occupant Safety Restraint Systems sold to manufacturers at collusive and noncompetitive prices.

118.     On November 21, 2013, the DOJ announced that three high-level Takata executives, Yasuhiko Ueno, Saburo Imamiya, and, Yoshinobu Fujino pleaded guilty to three separate one-count criminal Informations charging them with participating in a conspiracy to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. In connection with their guilty pleas, the Takata executives were criminally fined $20,000 each and sentenced to serve between 14 and 19 months in U.S. prison. Ueno's criminal Information notes that he was employed by Defendant TK Holdings Inc., in the United States as senior vice president for sales for Japanese manufacturers from at least January 2006 through December 2007.

119.     A fourth Takata executive, Gary Walker - employed by Defendant TK Holdings, Inc. - pleaded guilty to a one-count criminal Information charging him with participating in a

conspiracy to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts sold to Toyota, Honda, Nissan, Fuji Heavy Industries (Subaru) and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. In connection with his guilty plea, Walker was criminally fined $20,000 and sentenced to serve 14 months in a U.S. prison. A fifth Takata executive, Gikou Nakajima, was indicted on June 5, 2014 for his participation in a conspiracy to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to Honda, Nissan, Fuji Heavy Industries (Subaru) and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.

120.    On January 22, 2015, the DOJ announced that a Detroit federal grand jury returned a one count indictment against an executive at Takata Corp. for conspiring to rig bids for, and to fix, stabilize and maintain the prices of, seatbelts sold to Toyota Motor Corp., Honda Motor Company Ltd., Nissan Motor Co., Ltd., Mazda Motor Corp., Fuji Heavy Industries Ltd., and/or certain of their subsidiaries, for installation in vehicles manufactured and sold in the United States and elsewhere, through at least February 2011.

**TRW's Plea Agreement**

121.    Defendant TRW Germany has agreed to plead guilty and agreed to pay a total of $5.1 million in criminal fines concerning a two-count criminal investigation for fixing the prices of seatbelts, steering wheels and airbags. TRW Germany has admitted to conspiring with others to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Occupant Safety Restraint Systems sold to certain manufacturers in the United States and elsewhere at various times from at least as early as January 2008 to until at least June 2011 in violation of the Sherman Act, 15 U.S.C. § 1.  Among

other things, TRW Germany admitted to: (a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain manufacturers for Occupant Safety Restraint Systems; (b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain manufacturers for Occupant Safety Restraint Systems; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain manufacturers on a model-by-model basis; (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain manufacturers; (e) submitting bids and price quotations to certain manufacturers in accordance with the agreements reached; (f) selling Occupant Safety Restraint Systems to certain manufacturers at collusive and noncompetitive prices; (g) accepting payment for Occupant Safety Restraint Systems sold to certain manufacturers at collusive and noncompetitive prices; and (h) engaging in meetings, conversations and communications for the purpose of monitoring and enforcing adherence to the agreed upon bid rigging and price-fixing scheme.

122.    The plea agreement requires it and its subsidiaries to cooperate with the DOJ, including producing documents in their control and providing their "directors, officers and employees" for interviews and the provision of testimony in grand jury, trial and other judicial proceedings.

123.    The plea agreement further provides that upon acceptance of the agreement, the United States will not bring further criminal charges against, among other entities, TRW Germany's subsidiaries arising out of the conspiracy.

124.    Pursuant to the plea agreement, TRW Germany agreed that if the United States determines that it or its subsidiaries fail to provide truthful and continuing cooperation, the

United could elect to subject TRW Germany or its subsidiaries to criminal prosecution and that the United States would have the right, among other things, to prosecute both TRW Germany and its subsidiaries for the conspiracy set forth in the plea agreement.

**Tokai Rika's Plea Agreement**

125.    On December 12, 2012, Tokai Rika agreed to pay a $17.7 million fine and plead guilty to a two-count criminal information charging Tokai Rika with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Heater Control Panels sold to a manufacturer from at least September 2003 until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

126.    The information also charged Tokai Rika and one of its executives with obstruction of justice for directing employees to delete electronic data and destroy paper documents, which destroyed evidence relevant to the government's investigation into Tokai Rika's antitrust violations in violation of 15 U.S.C. § 1512(b)(2)(B). Tokai Rika's plea agreement states "[a]fter becoming aware of the FBI search of the defendant's United States subsidiary, an executive of the defendant directed employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes. As a result, electronic data were deleted and paper documents were destroyed, including data and documents evidencing antitrust crimes, and some of the deleted electronic data and destroyed paper documents were non-recoverable."

127.    Tokai Rika's plea agreement requires it and its subsidiaries to cooperate with the DOJ, including producing documents in their control and providing their "directors, officers and employees . . ." for "interviews and the provision of testimony in grand jury, trial and other judicial proceedings . . . ."

128.    According to the criminal information filed against Tokai Rika, Tokai Rika and its co-conspirators carried out the conspiracy by: (a) participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations; agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted; (c) agreeing, during those meetings, conversations, and communications, to allocate the supply of [Heater Control Panels]; (d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments; (e) submitting bids, price quotations, and price adjustments in accordance with the agreements reached; selling [Heater Control Panels] in the United States and elsewhere at collusive and noncompetitive prices; (g) accepting payment for [Heater Control Panels] sold at collusive and noncompetitive prices; (h) engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and (i) employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

129.    Tokai Rika's plea agreement states that during a period from at least as early as September 2003 until at least February 2010 Tokai Rika's sales of Heater Control Panels subject to the conspiracy totaled approximately $73.6 million.

130.    Tokai Rika's plea agreement is evidence of its participation in the conspiracy for vehicle parts generally, including Occupant Safety Restraint Systems, which Tokai Rika also sells.

   **E.    Additional Criminal Pleas Related to Conspiracies in the Vehicle Parts Industry**

131.    In addition to Autoliv, Inc., Takata, TRW Germany, and Tokai Rika, a number of other manufacturers of vehicle parts have pleaded guilty, or agreed to plead guilty, to price fixing

and bid rigging in the vehicle parts industry, including: Furukawa Electric Co., Ltd.; Yazaki

Corp.; G.S. Electech, Inc.; Fujikura Ltd.; Denso Corporation; and Nippon Seiki Co. Ltd.  These

companies have pleaded guilty to engaging in the same conduct as Autoliv, Inc. with regard to

Vehicle Wire Harness Systems, Instrument Panel Clusters, Fuel Senders and Heater Control

Panels. The majority of these violators pleaded guilty to engaging in bid-rigging, price-fixing,

and market allocation during the same time period as Autoliv, Inc. with multiple OEMs as their

targets.

132.    On September 29, 2011, the DOJ announced that Defendant Furukawa Electric

had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing

and bid-rigging conspiracy involving the sale of Vehicle Wire Harness Systems to automobile

manufacturers.  Three Furukawa executives, who are Japanese nationals, also agreed to plead

guilty and to serve prison time in the United States.

133.    On January 30, 2012, Yazaki Corporation and four of its executives, Tsuneaki

Hanamura ("Hanamura"), Ryoji Kawai ("Kawai"), Shigeru Ogawa ("Ogawa") and Hisamitsu

Takada ("Takada"), agreed to plead guilty to conspiring to rig bids, fix prices and allocate

customers for Vehicle Wire Harness Systems from January 2000 until at least February 2010.

134.    Denso Corporation has pleaded guilty and agreed to pay a total of $78 million in

criminal fines concerning a two-count criminal information charging Denso Corporation with:

(1) participating in a combination and conspiracy with its co-conspirators to suppress and

eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix,

stabilize, and maintain the prices of body electronic control units sold to an automobile

manufacturer in the United States and elsewhere from at least as early as January 2000 and

continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1; (2)

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Vehicle Wire Harness Systems sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

135.    On April 3, 2012, G.S. Electech Inc. agreed to plead guilty to "participat[ing] in a combination and conspiracy to suppress and eliminate competition in the automotive industry by agreeing to rig bids for, and to fix stabilize, and maintain the prices of, speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere."

136.    On April 23, 2012, Fujikura, Inc. agreed to plead guilty to participating in the conspiracy to fix prices, rig bids and allocate supply with regard to Vehicle Wire Harness Systems,4 between January 2006 and February 2010.

137.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its role in a conspiracy to fix prices of instrument panel clusters installed in vehicles sold in the United States and elsewhere.

138.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its role in a conspiracy to fix prices of ignition coils sold to Ford Motor Co., Toyota Motor Corp., Fuji Heavy Industries Ltd. and certain of their subsidiaries and installed in vehicles sold in the United States and elsewhere.

139.    In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

140.    On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of switches, steering angle sensors and automotive high intensity discharge (HID) ballasts sold to Toyota Motor Corp., Toyota Motor Engineering & Manufacturing North America Inc., Honda Motor Co. Ltd., American Honda Motor Co., Inc., Mazda Motor Corp., Mazda Motor of America Inc., Nissan Motor Co. Ltd., and Nissan North America Inc. and installed in vehicles sold in the United States and elsewhere.

141.    On September 26, 2013, nine additional Japanese motor vehicle suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products sold to Chrysler, Ford, and General Motors, as well as to the U.S. subsidiaries of Honda, Mazda, Mitsubishi, Nissan, Toyota, and Fuji Heavy Industries:

(a)    Hitachi Automotive Systems Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of motor vehicle parts including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold to motor vehicle manufacturers in the United States and elsewhere;

(b)    Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of motor vehicle parts including fan motors, windshield washer systems and components, windshield wiper systems and components, starter motors, and power window motors sold to motor vehicle manufacturers in the United States and elsewhere.  Defendant Mitsuba Corporation also agreed to plead guilty to one count of obstruction of justice, because of the

company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the parts industry;

(c)     Mitsubishi Electric Corporation agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of numerous motor vehicle parts sold to motor vehicle manufacturers in the United States and elsewhere;

(d)     Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to motor vehicle manufacturers in the United States and elsewhere;

(e)     T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers (ATF warmers) sold to motor vehicle manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the pries of air conditioning systems sold to motor vehicle manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to motor vehicle manufacturers in the United States and elsewhere;

(h)     NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to a motor vehicle manufacturer in the United States and elsewhere; and

(i)     Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay a $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of anti-vibration rubber products sold in the United States and elsewhere to motor vehicle manufacturers.

142.    On the same day, September 26, 2013, United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing motor vehicle parts investigation.  He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers."  Holder also described how the conspiracies worked:  "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies.  In order to keep their illegal conduct secret, they used code names and met in remote locations.  Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the vehicle parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers.  As a result of these conspiracies, Americans paid more for their cars."

143.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various motor vehicle manufacturers have admitted price-fixing.



144.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of components involving anti-vibration rubber and driveshaft parts installed in motor vehicles sold in the United States and elsewhere.

145.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of high-intensity discharge (HID) lamp ballasts sold to Toyota Motor Corp., Nissan Motor Corp., and Fuji Heavy Industries Ltd. and certain of their subsidiaries, affiliates, and suppliers and installed in motor vehicles sold in the United States and elsewhere.

146.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-

fixing conspiracies involving motor vehicle lighting fixtures and high-intensity discharge (HID) lamp ballasts installed in motor vehicles sold in the United States and elsewhere.

147.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to Nissan Motor Co. Ltd. and certain of its subsidiaries in the United States and elsewhere.

148.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of anti-vibration rubber parts sold to Toyota Motor Corp., Nissan Motor Corp., Fuji Heavy Industries Ltd., Suzuki Motor Corp., Isuzu Motors Ltd., and certain of their subsidiaries, affiliates, and suppliers and installed in motor vehicles sold in the United States and elsewhere.

149.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies sold to Honda Motor Co. Ltd. and certain of its subsidiaries and installed in motor vehicles sold in the United States and elsewhere.

150.    On August 19, 2014, the DOJ announced that NGK Spark Plug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors sold to manufacturers such as DaimlerChrysler AG, Honda Motor Co. Ltd., and Toyota Motor Corp. and installed in motor vehicles sold in the United States and elsewhere.

151.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices sold to various manufacturers including General

Motors Company, Nissan Motor Company Ltd., Volvo Car Corporation, and BMW AG, in the United States and elsewhere.

152.    On November 14, 2014, the DOJ announced that a federal grand jury returned a one-count indictment against two executives of NSK Ltd. and JTEKT Corporation for conspiring to fix the prices of bearings sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America Inc. in the United States and elsewhere, through at least July 2011.

153.    On November 24, 2014, Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and pay a single criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters sold to Hyundai Motor Co., Kia Motors Corp. and Kia Motors Manufacturing Georgia in the United States and elsewhere.

154.    On December 1, 2014, the DOJ announced that a former executive of Mitsuba Corporation agreed to plead guilty and serve 13 months in a U.S. prison for conspiring to fix the prices of windshield wiper systems and starter motors sold to Honda Motor Co. Ltd. and its subsidiaries and affiliates in the United States and elsewhere.

155.    On December 1, 2014, the DOJ announced that an executive of T.RAD Co. Ltd. agreed to plead guilty and to serve one year and one day in a U.S. prison for participating in a conspiracy to fix princes of radiators sold to Honda Motor Co. Ltd. and certain of its subsidiaries in the United States and elsewhere.

156.    On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and to pay a $3.2 million criminal fine for its role in a conspiracy to suppress and eliminate competition for the purchase of compressors used in air conditioning systems sold to

Nissan North America Inc. for installation in vehicles manufactured and sold in the United States and elsewhere.

157.    On February 5, 2015, the DOJ announced that a Detroit federal grand jury returned a two-count indictment against two former executives of Mitsuba Corporation for their role in conspiring to fix the prices of various vehicle parts, including windshield wiper systems and components, sold to Honda Motor Company Ltd., Nissan Motor Co., Ltd., Toyota Motor Co., Ltd., Chrysler Group, LLC, and Fuji Heavy Industries Ltd., and certain of their subsidiaries in the United States and elsewhere.  The executives are also charged with knowingly and corruptly persuading, and attempting to persuade, employees of Mitsuba to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

158.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors, and starter motors to vehicle and internal combustion engine manufacturers such as DaimlerChrysler AG, Ford Motor Company, General Motors Company, and Adreas Stihl AG & Co., among others, in the United States and elsewhere, until at least July 2011.  Bosch was also charged with participating in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of, starter motors sold to Volkswagen AG and certain subsidiaries in the United States through at least June 2010.

159.    On April 23, 2015, an executive of Hitachi Automotive Systems Ltd. pleaded guilty and was sentenced to serve 15 months in a U.S. prison for his role in conspiring to allocate the supply of, rig bids for, and fix, stabilize, and maintain the price of various parts including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems,

electronic throttle bodies, ignition coils and inverters and/or motor generators, to manufacturers including Ford Motor Co., General Motors LLC, Nissan Motor Co. Ltd., Toyota Motor Corp., and Honda Motor Co. Ltd., and certain of their subsidiaries.

160.    On April 28, 2015, the DOJ announced that Yamada Manufacturing Co. Ltd. agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to fix prices and rig bids for manual steering columns sold to certain subsidiaries of Honda Motor Co. in the United States and elsewhere, continuing until as late as September 2012.

161.    On May 14, 2015 the DOJ announced that a Detroit federal grand jury returned a one count indictment against the former executive managing director of T.RAD Co. Ltd. for his role in conspiring to fix the prices of radiators sold to Honda Motor Co. Ltd., Toyota Motor Corp., and certain of their subsidiaries in the United States and elsewhere.

162.    To date, 35 companies pleaded or agreed to plead guilty and 53 individuals have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the motor vehicle parts industry.  All together, the 35 guilty-pleading companies have paid or agreed to pay approximately $2.5 billion in criminal fines.

## F.    Investigations involving the sale of parts for Trucks and Equipment

163.    The first public announcements of government investigations and penalties that indicated that the conspiracies included parts sold for Equipment was on March 29, 2013, when the JFTC issued cease and desist orders and surcharge payment orders based on violations of the Japan Antimonopoly Act against NTN Corp., NSK Ltd. and Nachi-Fujikoshi Corp., for conspiring to fix prices on "industrial machinery bearings and automotive bearings."

164.    The first public announcements of government investigations and penalties that indicated that the conspiracies included parts sold for Trucks was on March 19, 2014, when the EC announced that the "producers of car and truck bearings" had operated a cartel in the market

for bearings sold to "car, truck and car part manufacturers." The EC fined SKF, Schaeffler, NSK Ltd., Nachi-Fujikoshi, and NTN EUR 953 million. JTEKT, which also was found to have conspired to fix prices, benefitted from immunity for having revealed the existence of a cartel to the EC.

165.     On March 31, 2015, the Department of Justice announced that Robert Bosch GmbH had agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix the prices for parts, including spark plugs, oxygen sensors and starter motors "sold to automobile and internal combustion engine manufacturers in the United States and elsewhere," including parts sold to equipment manufacturer Andreas Stihl AG & Co., from at least as early as January 2000 until at least July 2011.

### G.     Likely Existence of An Amnesty Applicant

166.     The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party who has been accepted into the DOJ's ACPERA program as an amnesty applicant. One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

167.     In light of the multiple guilty pleas in this case, in related vehicle parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

**H.      Damage to Plaintiffs and Other Truck and Equipment Dealers Caused by Defendants' Illegal Activities.**

168.    Deputy Assistant Attorney General Scott Hammond, recently stated that the vehicle parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."

169.    Occupant Safety Restraint Systems  and many of the motor parts involved in the government investigations and proceedings are also used in connection with Trucks and Equipment.

170.    Defendants' conspiracy impacted the market for Trucks and Equipment.

171.    Many of the OEMs identified as having purchased products from  members of the cartel, including Toyota, Ford, Chrysler, Mitsubishi Motors, Fuji Heavy Industries, Honda, Subaru, Isuzu and Nissan, manufacture and sell Trucks and/or Equipment directly or through subsidiaries or affiliated companies.

172.    Upon information and belief, many of the Defendants' employees who were involved in negotiating the prices of Occupant Safety Restraint Systems and other parts sold to automobile OEMs were the very same individuals  involved in negotiations over the pricing on sales of the same parts for Trucks and Equipment.

173.    Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Occupant Safety Restraint Systems from them and in those purchasers raising their prices to subsequent purchasers.

174.    Having paid higher prices for components of the Trucks and Equipment they sold to Plaintiffs and the Classes and the Occupant Safety Restraint Systems they sold to Plaintiffs and the Classes, firms who sold such Occupant Safety Restraint Systems and Trucks and Equipment passed Defendants' overcharges on to Plaintiffs and the Classes.

175.     Plaintiffs and the Classes are entitled to the overcharges they paid for Occupant Safety Restraint Systems.

176.     Plaintiffs and the Classes had to and did absorb, at the very least, a significant portion of the overcharges that they paid due to Defendants' illegal activities.

177.     Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

178.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All Truck and Equipment dealers that during the Class Period, (a) indirectly purchased Occupant Safety Restraint Systems manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased Trucks or Equipment containing Occupant Safety Restraint Systems manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

179.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, (except California as to unjust enrichment claims), as well as unjust enrichment laws of Missouri, Massachusetts, Illinois, South Carolina, and Tennessee. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, Illinois, South Carolina, and Tennessee are collectively referred to as the "Indirect Purchaser States." These claims are brought by Plaintiffs

on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All Truck and Equipment dealers, in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Occupant Safety Restraint Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased Trucks or Equipment containing Occupant Safety Restraint Systems manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

180.   The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities, and instrumentalities of the federal government, states, and their subdivisions, agencies, and instrumentalities.

181.   Although Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least hundreds of members in each Class.

182.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Occupant Safety Restraint Systems sold in the United States;

(b)   The identity of the participants of the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Occupant Safety Restraint Systems sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

183.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct because they paid artificially inflated prices for Occupant Safety Restraint Systems purchased indirectly from Defendants or their co-conspirators.

184.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

185.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

186.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism provide injured entities with a method for obtaining redress for claims that might not be practicable to pursue individually and substantially outweigh any difficulties that may arise in the management of this class action.

187.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY**

188.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Occupant Safety Restraint Systems;

(b)    The prices of Occupant Safety Restraint Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Defendants charged purchasers of their Occupant Safety Restraint Systems inflated, fixed and stabilized prices for such Occupant Safety Restraint Systems;

(d)    Having paid higher prices for components of the Trucks and Equipment they sold to Plaintiffs and the Classes and the Occupant Safety Restraint Systems they sold to Plaintiffs and the Classes, firms who sold Defendants' Occupant Safety Restraint Systems and Trucks and Equipment to Plaintiffs and the Classes passed Defendants' overcharges on to them;

(e)    Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

(f)    Truck and Equipment dealers purchasing Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems have been deprived of free and open competition.

189.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Occupant Safety Restraint Systems, as a result of Defendants' conspiracy.

190.    An increase in the prices of Occupant Safety Restraint Systems caused an increase in the price of Trucks and Equipment during the Class Period.

191.    The market for Occupant Safety Restraint Systems and the market for vehicles, including Trucks and Equipment are inextricably linked and intertwined because the market for Occupant Safety Restraint Systems exists to serve the vehicle market. Without the vehicles, the Occupant Safety Restraint Systems have little to no value because they have no independent utility and must be inserted into vehicles to serve any function.  Indeed, the demand for vehicles creates the demand for Occupant Safety Restraint Systems.

192.    Occupant Safety Restraint Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle and are not altered during the manufacturing process. As a result, Occupant Safety Restraint Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Occupant Safety Restraint Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

193.    Just as Occupant Safety Restraint Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Occupant Safety Restraint Systems affect prices paid by indirect purchasers of new Trucks and Equipment containing Occupant Safety Restraint Systems.

194.    Occupant Safety Restraint Systems have their own part numbers, which permit them to be tracked.

195.    Occupant Safety Restraint Systems are pieces of sophisticated equipment that are necessary to operate a vehicle.

196.    Occupant Safety Restraint Systems are found in every modern vehicle and can be removed from a finished vehicle and replaced.

197.    The Occupant Safety Restraint Systems subject to Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles, including Trucks and Equipment. Whether Occupant Safety Restraint Systems are sold by themselves or in vehicles, their purpose is to be inserted into vehicles to protect drivers and passengers from bodily harm.

198.    Occupant Safety Restraint Systems comprise a not insignificant portion of the cost of a vehicle.

199.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Occupant Safety Restraint Systems and, as a direct and foreseeable result, the price of new vehicles containing Occupant Safety Restraint Systems and the price of Occupant Safety Restraint Systems purchased for repair purposes. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Occupant Safety Restraint Systems on prices for new Trucks and Equipment even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how

variation in the price of Occupant Safety Restraint Systems affects changes in the price of new Trucks and Equipment. In such models, the price of Occupant Safety Restraint Systems would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Occupant Safety Restraint Systems impact the price of new Trucks and Equipment containing Occupant Safety Restraint Systems while controlling for the impact of other price-determining factors.

200.     The precise amount of the overcharge impacting the prices of new Trucks and Equipment containing Occupant Safety Restraint Systems can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and members of the Classes can be quantified.

201.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Occupant Safety Restraint Systems than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiffs' and Class members' damages are measureable.

**PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

**A.     The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover the Claims**

202.     Plaintiffs repeat and reallege the allegations set forth above.

203.     Plaintiffs and the members of the Classes had no knowledge that the combination or conspiracy alleged herein involved Trucks and Equipment, or of facts sufficient to place them on inquiry notice of the claims set forth herein until the public announcement by the JFTC on

March 29, 2013 of investigations and fines in connection with the sale of bearings for industrial machinery and the public announcement by the EC on March 19, 2014 of investigations and fines in connection with the sale of bearings to truck manufacturers.

204.    Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein with respect to parts for Trucks and Equipment prior to the announcements by the JFTC and EC on March 29, 2013 and March 14, 2014.

205.    Although there was disclosure of certain facts indicating that the government investigations involved price-fixing for automotive parts, no information in the public domain was available to the Plaintiffs and the members of the Classes that Trucks and Equipment were involved in the conspiracy being investigated by the government enforcement agencies prior to the public announcement of the JFTC's and EC's enforcement activity.

206.    Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein with respect to Trucks and Equipment until the announcements of the government investigations by the JFTC and EC on March 29, 2013 and/or March 14, 2014.

207.    Plaintiffs and the members of the Classes are Truck and Equipment dealers who had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint  until the public announcement of the JFTC's enforcement activity on March 29, 2013 and the EC's enforcement activity on March 14, 2014.

208.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint..

**B.    Fraudulent Concealment Tolled the Statute of Limitations**

209.    Defendants' agreements, understandings and conspiracies with respect to Trucks and Equipment were kept secret and, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct and that they were paying supracompetitive prices for parts in Trucks and Equipment, throughout the United States, during the Class Period.

210.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

211.    By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the Occupant Safety Restraint Systems industry for Trucks and Equipment to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices for Occupant Safety Restraint Systems for Trucks and Equipment.

212.    As explained in the Informations filed against several of the Defendants, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.  Also, certain of the conspirators have plead guilty to destroying incriminating electronic and paper documents upon learning of government investigations into the vehicle parts antitrust conspiracy which further concealed the conspiracy.

58

213.    Certain conspirators made false statements denying liability following the February 2010 raids conducted by the JFTC, ED, and FBI.  Following the FBI raid of its office, a spokesman for Tokai Rika stated "[w]e haven't done anything wrong."  Lear's chairman and CEO stated that "I am confident that our Company is not involved in any anti-competitive practices."

214.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy and combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination and conspiracy.

215.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, including through fraudulent misrepresentations, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed to fix prices on parts for Trucks and Equipment until the JFTC and EC announced their investigations and enforcement activities included industrial machinery and truck parts.

216.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

217.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

218.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

219.    At least as early as January 2003, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Occupant Safety Restraint Systems, thereby creating anticompetitive effects.

220.    The anticompetitive acts were intentionally directed at the United States market for Occupant Safety Restraint Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Occupant Safety Restraint Systems throughout the United States.

221.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Occupant Safety Restraint Systems.

222.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Occupant Safety Restraint Systems have been harmed by being forced to pay inflated, supracompetitive prices for Occupant

Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

223.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

224.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Occupant Safety Restraint Systems has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Occupant Safety Restraint Systems sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c)    Prices for Trucks and Equipment purchased by Plaintiffs and the members of the Nationwide Class containing Occupant Safety Restraint Systems manufactured by Defendants and their coconspirators were inflated; and

(d)    Plaintiffs and members of the Nationwide Class who purchased Occupant Safety Restraint Systems indirectly from Defendants have been deprived of the benefits of free and open competition.

225.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems than they would have paid and will pay in the absence of the conspiracy.

226.     Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, bid-rigging, and market allocations, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

227.     Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems because they are required to purchase Trucks and Equipment and Occupant Safety Restraint Systems to continue to operate their businesses.

228.     Plaintiffs and members of the Nationwide Class continue to purchase Trucks and Equipment and Occupant Safety Restraint Systems, on a regular basis.

229.     Trucks and Equipment and Occupant Safety Restraint Systems continue to be sold at inflated and supracompetitive prices.

230.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

231.     Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

232.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF

**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

233.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

234.    From as early as January 2003 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Occupant Safety Restraint Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

235.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Occupant Safety Restraint Systems, to rig bids for the sale of Occupant Safety Restraint Systems and to allocate customers for Occupant Safety Restraint Systems in the United States.

236.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Occupant Safety Restraint Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Occupant Safety Restraint Systems sold in the United States;

(b)    allocating customers and markets for Occupant Safety Restraint Systems in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

237.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Occupant Safety Restraint Systems.

238.    Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code.  Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Occupant Safety Restraint Systems at supracompetitive levels.

(b)    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Occupant Safety Restraint Systems.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Occupant Safety Restraint Systems; and (2) Allocating among themselves the production of Occupant Safety Restraint Systems.

(d)    The combination and conspiracy alleged herein has had, *inter alia,* the following effects upon the commerce of California: (1) Price competition in the sale of Occupant Safety Restraint Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Occupant Safety Restraint Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the

State of California and throughout the United States; and (3) Those who purchased Occupant

Safety Restraint Systems or Trucks and Equipment containing Occupant Safety Restraint

Systems manufactured by Defendants and their co-conspirators have been deprived of the benefit

of free and open competition.

(e)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property in that they paid

more for Occupant Safety Restraint Systems than they otherwise would have paid in the absence

of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the

California Business and Professions Code, Plaintiffs and members of the Damages Class seek

treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section

16750(a) of the California Business and Professions Code.

241.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant

Safety Restraint Systems price competition was restrained, suppressed, and eliminated

throughout the District of Columbia; (2) Occupant Safety Restraint Systems prices were raised,

fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia;

(3) Plaintiffs and members of the Damages Class, including those who resided in the District of

Columbia and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in the

District of Columbia, were deprived of free and open competition, including in the District of

Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in

the District of Columbia and/or purchased Occupant Safety Restraint Systems or Trucks and

Equipment in the District of Columbia, paid supracompetitive, artificially inflated prices for

66

Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems, including in the District of Columbia.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

242.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Occupant Safety Restraint Systems' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

Case 2:15-cv-12050-MOB-MKM   ECF No. 1   filed 06/05/15   PageID.68   Page 68 of 103

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

244.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

245.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Maine; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition: and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

247.    Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)      During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

248.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in Mississippi were deprived of free and open competition, including in Mississippi: and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in Mississippi paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems, including in Mississippi.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

249.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, et seq.

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in Nevada, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems, including in Nevada.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)    During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated

throughout New Mexico; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq.*

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in New York, were deprived of

free and open competition, including in New York; and (4) Plaintiffs and members of the

Damages Class, including those who resided in New York, paid supracompetitive, artificially

inflated prices for Occupant Safety Restraint Systems when they purchased, including in New

York, Occupant Safety Restraint Systems or Trucks and Equipment containing Occupant Safety

Restraint Systems, or purchased, including in New York, Occupant Safety Restraint Systems or

Trucks and Equipment that were otherwise of lower quality, than would have been absent the

conspirators' illegal acts, or were unable to purchase Occupant Safety Restraint Systems or

Trucks and Equipment that they would have otherwise have purchased absent the illegal conduct.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New

York commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct set forth above

is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek

all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

254.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant

Safety Restraint Systems price competition was restrained, suppressed, and eliminated

throughout North Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and

members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in North Carolina, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

255.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for

Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

256.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Trucks and Equipment or Occupant Safety Restraint Systems in South Dakota, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems including in South Dakota.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, et seq.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Annotated §§ 47-25-101, et seq.

259.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

260.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)    During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.* Plaintiffs are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in West Virginia, were deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Trucks and Equipment or Occupant Safety Restraint Systems in West Virginia, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated

throughout Wisconsin; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(b)      During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

263.      Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.  Plaintiffs and members of the Damages Class have paid more for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

264.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

265.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF

**Violation of State Consumer Protection Statutes
on behalf of Plaintiffs and the Damages Class**

266.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

267.    Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

268.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

269.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants marketed, sold, or distributed Occupant Safety Restraint Systems in California, and committed and continue to commit acts of unfair

competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of Occupant Safety Restraint Systems (or Trucks and Equipment containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout California; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Occupant Safety Restraint Systems or Trucks and Equipment in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in California, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems, including in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)      The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Occupant Safety Restraint Systems (or Trucks and Equipment containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.

Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

270.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)    Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems; and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for their Trucks and Equipment and Occupant Safety Restraint Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unlawful, unfair or deceptive

acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Plaintiffs and

members of the Damages Class seek all relief available under that statute.

271.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated

levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained

in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the

Damages Class.

(b)      Plaintiffs were not aware of Defendants' price-fixing conspiracy and were

therefore unaware that they were being unfairly and illegally overcharged.  There was a gross

disparity of bargaining power between the parties with respect to the price charged by

Defendants for Occupant Safety Restraint Systems.  Defendants had the sole power to set that

price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any

meaningful choice in purchasing Occupant Safety Restraint Systems because they were unaware

of the unlawful overcharge and because they had to purchase Occupant Safety Restraint Systems

in order to be able to operate their Trucks and Equipment.  Defendants' conduct with regard to

sales of Occupant Safety Restraint Systems, including their illegal conspiracy to secretly fix the

price of Occupant Safety Restraint Systems at supracompetitive levels and overcharge

consumers, was substantively unconscionable because it was one-sided and unfairly benefited

Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage

of Plaintiffs.

(c)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A.§ 57-12-3, in that such conduct, *inter alia,* resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Occupant Safety Restraint Systems as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Occupant Safety Restraint Systems.

(d)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.,* and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

272.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Occupant Safety Restraint Systems they had purchased as replacements and inside Trucks and Equipment had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Occupant Safety Restraint Systems were misled to believe that they were paying a fair price for Occupant Safety Restraint Systems or the price increases for Occupant Safety Restraint Systems were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(e)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New

York; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Trucks and Equipment or Occupant Safety Restraint Systems in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of Trucks and Equipment and Occupant Safety Restraint Systems in New York, paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems, and were subjected to Defendants' deceptive practices.

(f)     Defendants knew that their unlawful trade practices with respect to pricing Occupant Safety Restraint Systems would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)     Defendants knew that their unlawful trade practices with respect to pricing Occupant Safety Restraint Systems would have a broad impact, causing class members who indirectly purchased Occupant Safety Restraint Systems to be injured by paying more for Occupant Safety Restraint Systems than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)     During the Class Period, Defendants marketed, sold, or distributed Occupant Safety Restraint Systems in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed Occupant Safety Restraint Systems in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of Occupant Safety Restraint Systems and Trucks and Equipment, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers of Occupant Safety Restraint Systems in North Carolina: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Occupant Safety Restraint Systems or Trucks and Equipment in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiffs and members of the Damages Class,

including those who resided in North Carolina and/or purchased Occupant Safety Restraint

Systems or Trucks and Equipment in North Carolina, paid supracompetitive, artificially inflated

prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant

Safety Restraint Systems including in North Carolina.

(d)       During the Class Period, Defendants' illegal conduct substantially affected North

Carolina commerce and purchasers of Occupant Safety Restraint Systems and Trucks and

Equipment.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive

conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation,

implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed

inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have

been aware.  Moreover, Defendants deceptively concealed their unlawful activities by

conducting meetings and conversations in secret.

(e)       During the Class Period, each of the Defendants named herein, directly, or

indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold

and/or distributed Occupant Safety Restraint Systems in North Carolina.

(f)       Plaintiffs and members of the Damages Class seek actual damages for their

injuries caused by these violations in an amount to be determined at trial and are threatened with

further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq,* and, accordingly, Plaintiffs

and members of the Damages Class seek all relief available under that statute.

274.     Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of South Carolina Code Ann. §§ 39-5-10, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant

Safety Restraint Systems price competition was restrained, suppressed, and eliminated

throughout South Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for

Occupant Safety Restraint Systems and vehicles containing Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on

South Carolina commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the

members of the Damages Class seek all relief available under that statute.

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a

market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial

and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold,

distributed, or obtained in Vermont.

(b)      Defendants deliberately failed to disclose material facts to Plaintiffs and members

of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices

for Occupant Safety Restraint Systems.  Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' Occupant Safety Restraint Systems prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems and Trucks and Equipment containing Occupant Safety Restraint Systems.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Occupant Safety Restraint Systems, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Occupant Safety Restraint Systems at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### on behalf of Plaintiffs and the Damages Class

276.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

277.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra,* except California.  Plaintiffs also bring this claim under the laws of Missouri, Illinois, Massachusetts, South Carolina, and Tennessee on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those states.

278.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Occupant Safety Restraint Systems.

279.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Occupant Safety Restraint Systems.

280.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

281.    Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased Trucks and Equipment containing Occupant Safety Restraint Systems and

Occupant Safety Restraint Systems subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury.


Dated: June 5, 2015

                                        /s/ J. Manly Parks
                                        Wayne A. Mack
                                        J. Manly Parks
                                        **Duane Morris LLP**
                                        30 S. 17th Street

Philadelphia, PA  19103
Phone: (215) 979-1000
Fax: (215) 979-1020
wamack@duanemorris.com
jmparks@duanemorris.com

*Counsel for Truck and Equipment Dealer Plaintiffs*